## THE NATIONAL BANK OF THE METROPOLIS *vs.* SPRAGUE and others.

### MITCHELL & ALLEN, Trustees, *vs.* Same.

### KLOUS & HILLBURN *vs.* Same.

1. Although a husband may give to the wife her services and earnings as against his creditors, when she carries on a separate business, without his assistance, with her own means and on her own account, yet in all cases where a business is carried on by a husband and wife in co-operation, and the labor and skill of the husband are contributed and united with those of the wife, the business will be considered as that of the husband and not that of the wife, and the proceeds will not be protected for her as against his creditors.

2. The fruits of the wife's labor and skill, under such circumstances, are not her separate property within the terms or intention of the act for the better securing the property of married women.

3. Even if that act gave a wife the capacity to accept a gift of property from her husband, she could not be allowed to retain such gift as against

VOL. V.                          B

his creditors, when made under circumstances which would prevent it from being sustained in favor of a stranger.

4. A conveyance taken in the name of the wife, of property purchased with means of her husband, when in embarrassed circumstances, in order to screen it from his creditors, will be set aside as against future creditors.

5. A married woman who had no separate property, and had never carried on any separate business, made a power of attorney to her husband to carry on, in her name, a hotel. The husband was, at the time, extensively engaged in similar enterprises, and had become embarrassed. The husband negotiated and executed, in the name of his wife, acting as her attorney, articles of co-partnership with S., for conducting the hotel intended. Land and buildings for such hotel were subsequently purchased, and the deed for them was taken in the individual names of the wife and of S., her partner. A part of the first instalment of the purchase money was paid from money alleged to have been borrowed by the wife for the purpose, and a part was paid by the husband from his own means. The complainants advanced money to the husband, to be used in fitting up the hotel, upon the faith of his representations to them that he was the purchaser of a half interest in it. They now file a bill, praying that the wife may be decreed to hold the title to said property as trustee for her husband, and to convey it so as to be held subject to their remedy at law. *Held*— That the circumstances proved an intent on the part of the husband and wife to take the title in her name for the purpose of delaying and defrauding his creditors, and that the complainants were therefore entitled to the relief prayed.

6. Where one who has purchased lands upon an agreement that a part of the price shall be secured by a mortgage to be given upon the delivery of the deed, commences, without the written consent of the vendor, to erect buildings upon the land before the actual delivery of the deed and mortgage, the mortgage, if afterwards given, pursuant to the agreement, and duly registered, has preference over any lien claim which may have been filed for labor or materials furnished towards the buildings, although furnished before the execution of the mortgage.

7. A contract to convey land, although in writing, does not amount to a consent in writing to erect buildings, so as to make the estate of the vendor subject to a lien for a building erected by a tenant or other person. Hence, in this case, the estate of the vendor is not affected by the lien, but only the equitable estate of the purchaser.

8. In order to preserve the lien of a chattel mortgage beyond the first year, the re-filing a copy required by law must be done during the thirty days immediately preceding the expiration of the year. A re-filing before the commencement of the thirty days is unavailing. Such a mortgage must be postponed to the claims of subsequent creditors, purchasers, and mortgagees; but as against the mortgagors themselves, it is valid.

9. The mortgagees in a chattel mortgage upon hotel furniture, which

contained a provision that the mortgagors should retain the possession until default in payment, or until the chattels should be seized by execution or attachment, upon learning that a levy had been made, attended, by their attorney, at the hotel wherein the property was, and demanded possession. The mortgagors gave the attorney the keys, went with him through the hotel, opened the doors of the various rooms, and exhibited the furniture. It was then arranged that the property covered by the mortgage should be considered as stored for the mortgagees, and the attorney took away a napkin as a symbol of delivery of the whole. *Held*— That this transaction could not aid the claim of the mortgagees; it was not an actual and continued change of possession.

10. Although, for want of due filing or actual change of possession, a mortgage given by partners upon partnership property has been postponed to the claims of subsequent creditors of the firm, yet equity will give it priority over claims of creditors of individual partners. As against the mortgagors themselves, omission to file, or to change the possession, does not impair the mortgage; hence, any surplus which remains after discharging valid liens for firm debts must be applied to discharge the demand of the mortgagees, that being a partnership debt, in preference to individual debts of either partner.

11. The law of this state does not forbid debtors, though insolvent, to prefer creditors by making payments of money or transfers of property, or by giving mortgages or confessing judgments. And, although a preference thus created may operate to delay and hinder other creditors, yet, if not created for that purpose, but to secure or pay *bona fide* debts, it is lawful.

12. A mortgage executed by the partners of an insolvent firm, upon property of the firm, to a trustee for the holders of bonds to a large amount, issued by the firm to secure such creditors as were willing to accept the bonds as payment of, or security for their debts, is not void by reason of the provisions of the assignment act, but is valid to the extent of protecting all holders of such bonds who appear to be *bona fide* creditors for value. The bonds given to creditors for sums larger than their true debts, can be enforced only for the amounts really due. So far as these bonds are voluntary gifts, they are not good as against creditors.

13. The rule of courts of equity and bankruptcy, when partnership assets are to be administered there, that they must be applied to the partnership debts before any part can be appropriated for the partners, or to pay their individual debts, does not operate to defeat a lien fairly and lawfully created by the partners upon partnership assets in favor of individual creditors, before proceedings for a judicial administration were commenced.

14. Partners have the power, while the partnership assets remain under their control, to appropriate any portion of them to pay or secure their individual debts. A mortgage given by them to secure individual debts fairly due, is not rendered void by the mere fact that it operates to give

individual debts a preference over demands against the firm ; nor will such mortgage be set aside for that reason, by a court of equity, unless, perhaps, when created in contemplation of insolvency to give an improper preference.

15. If, in any case, one who has loaned money upon the credit of an individual partner, could have established a demand therefor against the firm, by proof that the money was borrowed and used for the benefit of the firm, the right to do so is lost by proceeding, with knowledge of the facts, to the recovery of judgment and the issuing of execution against the individual partner.

16. The only interest in property of the firm which can be reached by virtue of a creditor's bill, founded upon such a judgment and execution, is the share of the individual partner against whom the judgment is rendered, in the assets, after payment of all partnership debts.

17. An execution on a judgment against partners for a partnership debt may be levied upon the individual property of either partner, although the partnership property is sufficient to make the debt.

18. Real property, purchased with partnership funds, for the uses of the partnership business, must be regarded as partnership assets, within the rules of equity governing the application of assets to debts in controversies relative to the priority of creditors of a firm over those of individual partners.

The defendant, Christopher C. Sprague, in September, 1865, was proprietor of the Kirkwood House, a large hotel in the city of Washington. He had kept it for some time before, and continued to keep it for some time afterwards. He was also engaged in other enterprises, and was largely indebted. His wife, Lydia J. Sprague, had no separate property, and had not since her marriage been engaged in any separate business on her own account. On the 29th day of September, 1865, she executed, under her hand and seal, a power of attorney to her husband, to carry on, in her name, the hotel business at Long Branch, in this state, with full power to purchase, mortgage, sell, and demise, real and personal estate.

On the 1st of October, 1865, articles of partnership between her and Howard A. Stokes were executed in her name, signed by her husband as her attorney. The term of the partnership was five years; the business was to be hotel keeping at Long Branch; each party was to contribute

$15,000 of the capital; each to give personal attention to the business; profits were to be shared equally; and the name of the firm was Sprague & Stokes.

On the 7th day of September, 1865, C. C. Sprague and Howard A. Stokes had, by a written contract, agreed to purchase of Woolman Stokes the property at Long Branch, since known as the Continental Hotel property, for $75,000. Of this, Howard A. Stokes was to pay $15,000 November 1st, 1865; Sprague was to pay $6000 by November 16th, 1865, $4000 by January 1st, 1866, and $5000 April 1st, 1866, when the deed was to be delivered; $15,500 was to be paid by assuming mortgages to that amount then on the property, and the remaining $29,500 was to be secured by a mortgage on the property. This agreement was signed by Sprague and H. A. Stokes, but not by W. Stokes; $200 was paid by Sprague at the signing of the agreement. On the 15th of November, H. A. Stokes, who is the son of W. Stokes, gave his father his note for $15,000, which was accepted for his payment, and Sprague paid $3000 in cash. Sprague further paid to W. Stokes, in cash, $1800 on November 25th, 1865; $1000 December 29th, 1865; $2000 January 12th, 1866; $2000 more, some time in January, 1866, and gave him the note of Sprague & Stokes for $5000, some time before March 27th, 1866. On the day last mentioned, W. Stokes gave a deed for the property to Lydia J. Sprague and Howard A Stokes, and they, with C. C. Sprague, executed a bond and mortgage to W. Stokes for $29,500, the residue of the purchase money; this mortgage was duly registered within three days. W. Stokes did not know that the purchase was made for Lydia J. Sprague, or that she was a partner in the firm of Sprague & Stokes, until about January 1st, 1866. The $200 paid by Sprague at the signing of the agreement was his own money. The residue of the cash paid to W. Stokes, by him, he and his wife allege and testify was her money, which was borrowed by her on her own notes, of Seman Klous, of the firm of Klous & Hillburn; Alpheus J. Hillburn, of that firm, being her brother.

After the contract of sale, C. C. Sprague and H. Stokes took possession of the premises, and commenced erecting new buildings, and making extensive alterations and repairs in and about the two hotels then on the premises, which they connected by a new building, and they furnished anew the whole establishment, and expended for these purposes near $200,000.

The complainants (by which term is meant the National Bank of the Metropolis), in the winter of 1865 and 1866, and in the spring of that year, loaned to C. C. Sprague, by discounting drafts drawn by him upon A. M. White and others, about $65,000 dollars. These drafts were drawn payable to, and were endorsed by Sprague & Co., a name which represented C. C. Sprague only, and in which he carried on the business of the Kirkwood House. He told the cashier of the complainants, and A. M. White and Louis Stow, who were the acceptors of the drafts, that he had purchased half of a hotel establishment at Long Branch, and that he wanted the money to pay for that property, and fit it up. These parties all knew that he was engaged in the Kirkwood House, in a speculation called the Bolt machine, and in purchasing lots.

Besides $10,000 or $12,000 advanced by Klous to Mrs. Sprague to pay the purchase money, Klous & Hillburn claim to have advanced to the firm of Sprague & Stokes about $54,000 for expenses in re-building and furnishing the Continental Hotel. Of this, between $29,000 and $30,000 was paid by them to manufacturers of furniture, near Boston, to whom they introduced Mrs. Sprague, and who filled her orders for furniture on the credit of Klous & Hillburn. The residue of these advances was made upon drafts of Sprague & Stokes, principally upon a credit obtained by mortgages given by Sprague & Stokes to them for that purpose.

Woolman Stokes advanced money to Sprague & Stokes for finishing, furnishing, and carrying on the hotel, and was security for money obtained by them for the same purpose,

and claims that the firm owe him $95,703, including $42,-478, for which he is security for them.

On the 18th of May, 1866, C. C. Sprague and wife, and H. A. Stokes, gave to Klous & Hillburn a mortgage on the real estate for $35,000, which was duly registered May 21st, 1866; and on the 24th of May, 1866, they gave Klous & Hillburn a chattel mortgage on the furniture and goods at the hotel, in the schedule annexed, to secure the payment of $80,-000 in one year, in instalments, according to the promissory notes of Sprague & Stokes to Klous & Hillburn. This mortgage provided that Sprague & Stokes should retain possession of the chattels until default should be made in payment, or until seized by execution or attachment. The chattel mortgage was filed in the office of the county clerk July 20th, 1866, and a copy was re-filed May 12th, 1867, and not at any other time. The possession of the chattels remained with the mortgagors. About the 1st day of April, 1867, the attorney of Klous & Hillburn, having learned that this personal property had been levied upon, and was advertised for sale by the sheriff, went to the premises with a copy of the chattel mortgage, and demanded possession of the chattels of Mrs. Sprague. Mr. and Mrs. Sprague gave him the keys, and went with him through the house. He opened the doors of the different rooms, saw the furniture, and re-locked each door, and Mrs. Sprague consented to his storing them there. He took away, and produces as an exhibit, a napkin, which he has since retained in the name, and as symbol of possession of the whole. The residue was left in the house with Sprague & Stokes as before, and none but the select few who witnessed the ceremony knew that a change of possession had taken place. On the 26th of April, 1867, an agreement was entered into between Sprague & Stokes and Klous & Hillburn, by which the latter were to furnish the money to carry on the hotel that year, and to manage it by an agent to be furnished by them; Mr. and Mrs. Sprague, and H. A. Stokes, were to be employed in the management of the house, at a salary of $1000 each, to Mrs. Sprague and

H. A. Stokes. The house and furniture were to be put in the possession of Klous & Hillburn during the season, and the agreement was to be terminated at the end of the season for boarding. Under this agreement the business was carried on for that season, Mr. and Mrs. Sprague, and H. A. Stokes, being apparently in possession, and managing the house, except the finances. It was agreed between Sprague & Stokes, and Klous & Hillburn, when the mortgages were given, that if Klous & Hillburn should not advance the full amount of both, the deficiency should be taken from the chattel mortgage.

On the 8th of October, 1866, C. C. Sprague and Lydia his wife, and H. A. Stokes, executed a mortgage upon the real estate and furniture, dated September 1st, 1866, to C. H. Mitchell and R. Allen, jun., as trustees, to secure one hundred bonds for $1000 each, payable to bearer in three years from date, with coupons attached for interest half yearly, at seven per cent. This mortgage was acknowledged on the 8th and recorded on the 10th of October, in the office of the clerk of Monmouth county, and a copy filed on the 15th of that month, in the same office, and again on the 9th of October, 1867.

On the 2d of November, 1866, C. C. Sprague and Lydia his wife, and H. A. Stokes, executed to W. Stokes a chattel mortgage on certain chattels in it specified, some of which were included in the two previous chattel mortgages, and some were not included in them. This mortgage was filed November 7th, 1866, and re-filed October 25th, 1867, and was given to secure the payment of $12,000 of the debt due from Sprague & Stokes to W. Stokes.

On the 22d day of October, 1866, the complainants sued out of the Supreme Court a writ of attachment for their debt against C. C. Sprague as a non-resident debtor, and attached the real and personal property at the Continental Hotel. On the 5th of November, they filed their original bill in this court to have the conveyance of the real and personal estate there to Lydia J. Sprague, declared a fraud against them and the

other creditors of C. C. Sprague, alleging that they had been bought with the money of C. C. Sprague, and were held by her to protect them from his creditors, and praying that the same might, as to him, be decreed to be held by her in trust for him, and be conveyed so as to be held subject to the attachment, and for the payment of the debt of the complainants and such other creditors as should apply.

On this bill an injunction, tested November 7th, 1866, was issued, restraining Sprague and wife from conveying or encumbering the property, Klous & Hillburn from taking possession of or removing it, and the trustees and Sprague & Stokes from issuing any further bonds on the trust mortgage. This injunction was, some time within thirty days from its teste, served on Mr. and Mrs. Sprague, H. A. Stokes, and R. Allen, jun., but when does not appear.

On the 2d of November, 1866, C. C. and L. J. Sprague and H. A. Stokes made a mortgage on the real estate to A. V. Conover, for $1020.10, a debt due from Sprague & Stokes; this was registered November 10th, 1866.

On the 30th of November, 1866, a judgment was entered in the Supreme Court against C. C. Sprague in favor of the complainants, for $65,000, by confession on bond and warrant; and on the same day, but after the entry of the judgment, the attachment was discontinued, and the discontinuance entered on the record.

On the 20th of March, 1867, the complainants filed a supplemental bill, setting forth the discontinuance of the attachment on which the original bill was founded, and the entry of the judgment in the Supreme Court by confession, and that an execution had been issued thereon, and that, on the 1st day of December, 1866, the sheriff of the county of Monmouth levied on the interest of said C. C. Sprague in said real and personal property. This judgment and levy were set forth as the foundation of the relief prayed by it; that relief being the same as in the first bill, with the addition of a prayer that bonds issued by the trustees since the attachment to Woolman Stokes might be set aside as void.

After this, seventeen judgments were obtained against C. C. Sprague, L. J. Sprague, and H. A. Stokes, as the firm of Sprague & Stokes; the first was entered December 29th, 1866; the last, March 19th, 1868. The amount of the whole was $66,989.30. Five of these, amounting to $13,-590.20, were on lien claims for work and materials in the hotel; the other twelve, for $53,468.40, were general judgments only.

On the 2d of April, 1867, Mitchell & Allen, trustees, filed a bill to foreclose their trust mortgage, and W. Stokes was joined as complainant in the bill, which also prayed for the foreclosure of his purchase money mortgage, for $29,500. Stokes also held fifty-six of the bonds issued by the trustees.

On the 29th of March, 1867, Klous & Hillburn filed a bill to foreclose their mortgage for $35,000 on the real estate; and on the 13th of September, 1867, they filed another bill, to foreclose their chattel mortgage.

On the 10th of March, 1868, an order was made on an application, on all four of these suits, that the three bills of foreclosure be taken and considered as cross-bills to the bill filed by the complainants, the National Bank of the Metropolis, and that all the defendants in those suits should be taken as parties to the suit of those complainants, and that the suits should proceed together and be heard as one suit.

. Besides the judgment of the complainants, Benjamin Butterworth obtained a judgment in the Supreme Court against C. C. Sprague, on the 4th of December, 1867, for $1152.29.

S. Klous holds ten of the trustee bonds as security for the $10,000 or $12,000 advanced by him to L. J. Sprague; W. Stokes holds fifteen of them for the $15,000 due to him from his son, H. A. Stokes, for the original purchase; R. Allen holds one, and C. H. Mitchell holds two, which were handed to them as security in part for past and future services as counsel and as trustees, without any definite amount being agreed upon.

The other sixty-seven bonds are held by creditors of the firm; by some of them as security for debts of less amount

than the face of the bonds. All appear to have been delivered before the mortgage to Conover, and before any judgments against the firm, or at least before the persons who received them knew of such encumbrance.

Answers have been filed in all the suits, and evidence taken, to be used in all on the hearing; and upon these the argument was had.

*Mr. McCarter*, for complainants.

*Mr. McLean* and *Mr. B. Williamson*, for Klous & Hillburn.

*Mr. W. H. Vredenburgh*, for the lien creditors and judgment creditors, and for A. V. Conover.

*Mr. R. Allen, jun.*, for trustees.

*Mr. H. S. Little*, for W. Stokes.

THE CHANCELLOR.

The first question presented is that raised by the bill and supplemental bill of the complainants in the original suit. They claim that the title to this property, both real and personal, was put in the name of Mrs. Sprague to delay and hinder the creditors of her husband, and that as against them she must be held to hold the title in trust to pay his debts. Mrs. Sprague claims that the property was bought by her with money furnished to her by her friends, that none was furnished by her husband or his creditors, and that it is her separate property.

The contract for purchase was made by Sprague in his own name, and the first payment was out of his own money. It was made three weeks before the power of attorney, and longer still before the articles of partnership, and I have no doubt at the time of the purchase, it was intended that C. C. Sprague and H. A. Stokes should be the partners. Wool-

man Stokes, the vendor, did not know of the intention to change until the last of December. Sprague made the change, and he avowed to A. M. White, that the object was to put it beyond the reach of his creditors; and if his admissions to White are not competent evidence as against other defendants, or White's testimony is not to be relied upon, the whole history of the transaction shows that such was the object. Mrs. Sprague had no separate estate, had been married over sixteen years, and had never done any business on her own account. Sprague was involved in other large transactions, and was considerably in debt. Hotel keeping was his business; he had been engaged largely in it. He was expected, as Mrs. Sprague testifies, to keep this house. She had at an early day given him a power of attorney to carry it on and do everything connected with it in her name, showing that she expected that he and not herself should keep the hotel and carry it on. She had no distrust of him; there is no assignable reason for the title being in her name, except to avoid his creditors. The lame attempt on her part to assign a reason, when pressed, shows that there was no other. She says that she wanted this large hotel, capable of accommodating nine hundred guests, for *a home* for herself and her sick child.

The fact that Sprague devoted his time to re-building, fitting up, and keeping this hotel, and in a measure abandoned all other business for it, shows that it was intended as *his* business, not hers, and that it was in her name to prevent his creditors from reaching it. She had no property in it. For the money borrowed of Klous, and of Klous & Hillburn, even if on her own notes only, he was liable. The act of March 24th, 1862, (*Nix. Dig.* 548, § 7,) makes the husband and his property liable for all debts contracted by his wife, in business done or purchases made by her. Besides, the earnings and labor of a married woman belong to her husband; and although he may no doubt give them to her as against his creditors, when she carries on a separate business without his assistance, with her own means, on her

own account, yet in all cases where the business is carried on by both, and the labor and skill of the husband are contributed and mixed up with hers, the business will be considered as that of the husband, and not that of the wife, and the proceeds will not be protected for her as against his creditors. These earnings, even of the wife, are not within the terms or intention of the act for the better securing the property of married women; and did that act give her capacity to accept a gift of his property from her husband, she could not retain such gift any more than a stranger could as against his creditors; it would be a fraud on them. This doctrine was declared and applied in this court in the cases of *Crane* v. *Reford*, 2 *C. E. Green* 383, and *Quidort's Administrators* v. *Pergeaux*, 3 *C. E. Green* 472.

It does not appear when the complainants loaned their money to Sprague; some of it was certainly before the conveyance to her, but if it was all advanced afterwards, yet it is settled that a conveyance to defraud or delay future creditors will be set aside. *Beeckman* v. *Montgomery*, 1 *McCarter* 106; *Crane* v. *Reford*, *supra*; *Case* v. *Phelps*, 39 *N. Y. R.* 164.

On both these grounds, Mrs. Sprague must be decreed to hold this property subject to the claims of the creditors of her husband, in the same manner as if the conveyance had been made to him, and he had been the partner in the firm of Sprague & Stokes. This must be so held in justice to H. A. Stokes, who, for aught that appears, entered into partnership with Mrs. Sprague, and bought the property jointly with her, in good faith, supposing that she was the real partner, and that she was competent to enter into the contract of partnership, and in justice to the creditors of the firm.

The next question is, whether the purchase money mortgage to W. Stokes, for $29,500, has preference over lien claims. The claim of the lienholders is based upon the eleventh section of the mechanics' lien law, which declares the lien to be upon the estate which the owner had at or after the commencement of the building, subject to all prior

encumbrances, and free from all encumbrances created afterwards. But this, even if it admits of the construction claimed by the counsel for the lienholders, must be considered in connection with the fourth section, which declares that the estate of any owner shall not be subject to a lien for a building erected by a tenant, or other person, unless it be done by the consent of the owner, in writing. And in *The Associates* v. *Davison*, 5 *Dutcher* 415, it was held that a written contract to convey, did not amount to a consent, in writing, to erect buildings so as to satisfy this requirement. The estate of W. Stokes was not affected by the liens; the equitable estate of Sprague & Stokes was subject to them; and when W. Stokes conveyed to them, the mortgage given at the delivery of the deed prevented the legal estate from vesting in them even for an instant, his estate continued, and even the *words* of the eleventh section would not affect his title, because it is no part of the estate which Sprague & Stokes had *at* or *after* the commencement of the building. The object of the lien law, and every possible right of the lienholders, as well as the rights of the vendors, will be protected by this construction. And otherwise, no vendor could suffer a building to be commenced before the conveyance. The purchase money mortgage of W. Stokes must be held the first encumbrance on this property, in these suits. Of course it is subject to the mortgages upon it before he conveyed, to which it was made subject by his deed, which are not in question here.

The lien claims, on which judgments have been obtained, are the next encumbrances on the real property, and they must be paid *pro rata*, according to the amounts really due upon them.

The mortgage to Klous & Hillburn for $35,000 is the next encumbrance upon the real estate. Some question was made at the hearing as to the amount due on this mortgage, but in their responsive answer to the bill, they state that the whole $35,000 was paid by them, and they state the times and sums in which nearly the whole was paid. They state

in their testimony that the full amount was paid; both swear to this; though they do not produce the vouchers, and show how it was paid, and although there is some confusion in their testimony, there is not sufficient to overcome their responsive answer, and their positive evidence. Besides, they are contradicted by no one, so far as this $35,000 is concerned. Mr. and Mrs. Sprague both testify that they advanced on the two mortgages about $55,000, and as it is proved that the deficiency of advances, if any, must be taken from the chattel mortgage, there can be no room to doubt that the full amount of the $35,000, for which this mortgage was given, has been advanced, and is due upon it.

The chattel mortgage to Klous & Hillburn would be a lien upon the chattels, if it were not for the omission to file a copy of it within the time required by law. The act says it shall cease to be a lien, unless a copy is re-filed within thirty days before the expiration of the year. The words are plain and positive; there is no room for construction. The object indicated is a sensible one. The first filing might have been declared sufficient. But the object is to have a repeated declaration that the mortgage is kept alive, and how much is due on it. If this was not confined to the last month, or some definite time, at any time just before the mortgage was about being paid such copy and statement might be filed, and the mortgage would remain an apparent encumbrance for nearly a year after being paid. But it is not for the courts to find a good reason for every enactment; it is enough for them that it is so clearly enacted. The Supreme Court of New York, in *Newell* v. *Warner*, 44, *Barb.* 258, held that under their act, in precisely the same words, the filing before the thirty days was a nullity.

The possession taken by the attorney of Klous & Hillburn cannot aid them; such possession does not satisfy the object, or comply with the words of the act; they require an *actual* and *continued* change of possession; these words would seem to be inserted expressly to provide against such a sham as this. This mortgage must, therefore, be postponed to the

creditors of Sprague & Stokes, and to all subsequent pur-
chasers and mortgagors, but as against Sprague & Stokes, it
is good for the amount due on it. If any surplus remains
after the judgments against, and mortgages given by the
firm are paid, they will be entitled to receive the amount
due on it before either partner, or the individual creditors of
either. It is given for a firm debt, and the mortgage making
it a valid lien against the mortgagors, and every one but the
creditors of the firm who have acquired liens before the sale,
they will be entitled to such surplus. *Swift* v. *Hart*, 12
*Barb.* 530; *Thompson* v. *Van Vechten*, 27 *N. Y. R.* 582;
*Herrick* v. *King*, 4 *C. E. Green* 82.

It is next contended by the complainants and the judg-
ment creditors, that the mortgage to the trustees is void, for
two reasons : First, because it operates to delay and hinder
creditors ; and secondly, because being a mortgage of all or
nearly all of the property of the firm to the trustees, and not
being for the equal benefit of all the creditors, it is against
the express provision of the assignment act. It is settled by
a series of decisions had for years in this state, that a debtor,
although insolvent, has the right to prefer creditors by pay-
ments of money, transfers of property, giving mortgages,
and confessing judgments. This was so held by the Supreme
Court in *Garretson* v. *Brown*, 2 *Dutcher* 425, affirmed in
the Court of Errors, 3 *Dutcher* 644; and although such pref-
erence may delay and hinder other creditors, if not done for
that purpose, but to secure or pay *bona fide* debts, it is lawful.

This mortgage was made to secure such creditors as were
willing to accept the bonds as payment of, or security for
their debts. It was optional with them to accept or not; it
did not dispose of or assign all their property, but left the
equity of redemption of the whole in the debtors, so that any
creditor who did not choose to accept of the bonds could
bring suit and levy on the equity of redemption. The sale
was not delayed by the mortgage; only such creditors as
should take bonds would have the prior lien. Such is the
case wherever a mortgage is given to any creditor; he is

preferred by priority of security, but deferred in time of payment. In this respect, a mortgage is entirely different from an assignment. If a series of mortgages had been given to the twenty bondholders, either making them liens successive to each other, according to the time when given, or making them all concurrent liens, no one would have disputed their legality. There is no difference in the operation of the security or in principle, because the mortgage is executed to trustees, so that all the bonds may come in equally. This is simply a mortgage to twenty creditors, to secure $100,000 due to them. If the debt to the complainants had been due from the firm, a mortgage on the same property to them for $65,000 would have been valid. This is not less valid because to twenty creditors, and for a somewhat greater sum. The mortgage is a valid lien in the hands of the trustees, so far as it secures debts due by the firm. The mortgage does not include all the property; no debts due to the firm are included, and there certainly must have been debts due at the close of the season for board and on other accounts; and much personal property included in other mortgages is not included in this.

So far as these bonds are voluntary gifts, they are not good as against creditors. At the time this mortgage was given, the firm was no doubt insolvent; it could not have paid its debts if it had been called upon so to do, and been compelled to dispose of its property for that purpose. Another season, if it should prove prosperous, might enable it to pay its pressing debts, and to secure the others, and insure eventual success. The hope of this, no doubt, led to the effort by the mortgage. But, in this situation, the firm had no right to give away its property, or to give a mortgage or bond to any one without consideration. All bonds, given without sufficient legal consideration, are, as against creditors, invalid. The bonds given to creditors for amounts larger than their debts are only good for the amount of the debts really due by the firm; and those given to Mitchell

c *

& Allen are good only for the amount legally due to them respectively, at the time.

The question also arises, whether the ten bonds given to Klous to secure the advances made by him to Mrs. Sprague, which is her individual debt, and the fifteen bonds given to W. Stokes to secure the note of H. A. Stokes to him, which is his individual debt, are valid as against the creditors of the firm. As between the partners, the transaction is just and right; each would have his whole contribution to the partnership paid out of the partnership effects, and the amount paid for each would be equal. But as against creditors of the firm, this would seem unjust; they are entitled to have the whole partnership assets, including the amount contributed by each partner, appropriated to pay the debts of the firm. The rule in equity and in bankruptcy, when the partnership assets are administered there, is, that the partnership debts must first be paid out of the partnership assets before any part can be appropriated for the partners, or to pay their individual debts. But in this case the property is not being administered under the direction of this court. The partners have created liens upon the property before it came into the court, and my only power is to settle the validity and priority of the liens so placed upon the property. The partners, while the partnership property is still under their control, have the power to appropriate it to pay or secure their individual debts; as against them, the mortgage is good. These claims are for debts fairly due by them individually, and I do not think that the mere preference of individual debts over partnership debts is such a fraud upon partnership creditors that after it has been done it will be set aside by a court of equity. It certainly will not be set aside, unless in case of insolvency, or when done in contemplation of insolvency, to give an improper preference. And it is by no means clear to me that the firm, in October, 1868, was insolvent, unless forced to pay all debts immediately; on the contrary, I suppose that by the operation of this mortgage, they expected to be relieved from their

embarrassments, and to retrieve their fortunes by a successful season the next year. It was not done in contemplation of insolvency.

There is no room in this case for the doctrine contended for by the complainants' counsel, that as the money of complainants was used for the benefit of the firm, their claim may be made a debt of the partnership and recovered out of its property. The complainants, if the facts were as contended for, might, on that doctrine, have recovered a judgment against the partners at law; but where the advance is made on his credit to one partner in money, as it was in this case, the decided weight of authority is against the position. *Collyer on Part.*, §§ 477 and 504, and note; *Story on Part.*, §§ 134 and 140; 3 *Kent's Com.* 41 and 42, and authorities there cited.

But they have not sued the firm; they have elected, after they knew all the facts, to enter a judgment for this debt against Sprague, as his individual debt. The debt is merged in that judgment, and cannot now be recovered against the firm as a partnership debt, either at law or in equity, and for this case it must be considered an individual debt. The execution, which is the foundation of the complainants' standing in this court, is against C. C. Sprague, and the levy is upon his interest in the firm and the partnership; and, in such case, the interest affected by the levy, and which will pass by the sale, is the interest of the partner in the firm, that is, his one-half of the assets, after all the debts of the partnership are paid. This is the settled doctrine in equity, and the principle upon which relief is granted there, although there may still be some question at law, whether the levy and sale does not make the purchaser a tenant in common with the other partner in the property and goods sold. *Story on Part.*, §§ 260 and 264; *Collyer on Part.*, §§ 822 to 832, and notes.

On the other hand, an execution on a judgment against the partners, for a partnership debt, may be levied upon the individual property of either partner, without regard to the

partnership property being sufficient to make the debt. The real estate, in this case, must be treated as partnership property, although the title was in the partners, as tenants in common. It was purchased with the funds put in by the two partners, as their share of the capital, and it was purchased for the business for which the partnership was formed, which was to keep a hotel upon it; and the greater part of the money for which the firm is in debt was expended upon it.

The only interest, then, which the complainants can take in the property, by virtue of their judgment and execution, is the interest of Sprague, which is one-half of the property, after the partnership debts are paid.

The amount due on the mortgage to A. V. Conover must be paid out of the proceeds of the real estate, after the amount due on the purchase money mortgage to W. Stokes, and the amount due on the lien judgments, and the amount due on the trustee bonds have been paid; and next, the amount due for debt and costs on the several general judgments against the firm, in the order of their priority of record.

The mortgage to the trustees has priority over the chattel mortgage to W. Stokes upon the chattels included in both, and both have priority over the chattel mortgage to Klous & Hillburn.

The amount due on the chattel mortgage to Klous & Hillburn being for a partnership debt, and the mortgage being valid, as against the partners, must be preferred to the judgments of the complainants and of Butterworth.

The general judgment creditors of the firm must be preferred, in the proceeds of the chattels, to the chattel mortgage of Klous & Hillburn, and must be preferred, in this fund, according to the priority of the time of delivering the executions to the sheriff.

It must be referred to a master, to compute the amounts due on the mortgage to Woolman Stokes for $29,500, and on the mortgage to Klous & Hillburn for $35,000, and on the mort-

gage to A. V. Conover, and on the several judgments against the firm, whether for liens or otherwise, and upon the judgments of the complainants, and of Butterworth against C. C. Sprague; and to ascertain the amount due upon the chattel mortgage to Klous & Hillburn, and upon the bonds issued under the mortgage to the trustees.

And, in taking such account, the master must ascertain the amount received by Woolman Stokes, and Klous & Hillburn, or either of them, as the net proceeds of the business done at the hotel in the years 1867 and 1868, and must credit the same on the securities held by them, respectively, either as individuals or partners, unless they shall have paid the same upon other debts of Sprague & Stokes, hereby declared to be valid, and which shall be entitled to be paid according to the order of priority established.